312-579 Classic Hardware, Inc. v. L.J. Morse Construction Co. But the resolving paragraph that you're talking about, doesn't that apply to labor subcontractors? No, Your Honor. It applies to all subcontractors. It applies to us. And we were required to supply labor and material. And we incorporated that requirement with respect to the material in our subcontract with Classic. And that particular resolving provision that relates to the situation if there's a discrepancy between the plans and specifications, refers not only to work, but to quantities of material to be supplied. I do think that this is a clear case that it's a matter of trade usage or anything of that sort. I was sent a quote by Thomas Jefferson in the fullness of his life after his entire experience in politics and in government. And he wrote in a letter in 1823, Laws are made for men of ordinary understanding and should therefore be construed by the ordinary rules of common sense. Their meaning is not to be sought for in metaphysical subtleties which may make anything mean everything or nothing in pleasure. And frankly, that's what this trade usage argument is. It basically says you may say in the contract that everything that's required is our obligation. But it only means something different. It means only what we want it to mean. It means what's in this document and this document. Now, I think that's a red herring even if you accepted it because the locks are in the specifications and the quantities are listed on the floor plans. And those are the two documents which they contend is their sole duty to look into. But their duty under the purchase order was to look into all the plans and all the specifications and not just the door hardware. This happened to be in the door hardware section. And it happened to be on the plans and specifications in the elevations. So I don't know how that argument could even trace if it were to be accepted. But it shouldn't be accepted. The contract says that all the documents are to be incorporated and it's unambiguous. Would the hardware supplier have to assume then that all of these extra locks, these other cabinets, are the same as the 340? They are. I mean, they're all exactly the same. There's no difference between them. There are doors in their drawers and there's 738 of them. There's no indication of where the 340 would go as opposed to the 738. The cabinets are one area of the contract that's on A6 and A7. And it's merely a non-expert matter of counting. And that was what their own testimony... Well, but the architect couldn't count. I know, the architect couldn't count. The general contractor apparently couldn't count. Yes. And then obviously the hardware manufacturer didn't, or the supplier didn't look beyond, I guess probably didn't try to count. The supplier testified he didn't even read the contract. So I mean, I don't know how an ambiguity in the contract could equitably enter into the transaction when he didn't even read it. He read it after the fact and he was looking for a way to get some more money out of the transaction. But in any event, I mean, there were 19 extras. Perhaps there was extra fatigue by Will Counting. But in connection with this particular situation, it was not incumbent upon the architect. The risk of the architect's miscounting was allocated in the specification to the supplier. And I believe, regretfully, the mistake was made. And L.J. Morris certainly didn't want to have that made. We made no money on it. We just lost money on it. But in any event... On the locks, not the whole project. Well, no, we lost money on the extra. We didn't get any extra money for this mistake. It wasn't our advantage that there would be a conflict with Classic. It was just part of the way the contract allocated the risk. It was a huge contract and involved thousands of trade contracts or thousands of different pieces and specifications and components. This one, the architect made a mistake on the takeoff. But that's what the supplier is supposed to do is make that count and not to rely upon that. That's what the architect provided, and that's what they found when the extra was submitted. And it's a shame, but we had to pay it, and they had to supply everything we had to pay for. That was what our contract with them was, and we should not have paid extra for something that was within the scope of their contract. Yes? Okay, thank you, Mr. Covey. Mr. Turner? Good morning. May I please report? Good morning. My name is Howard Turner, and I am the attorney for the appellee Classic Harper. LJM's argument is really based in large part on the claim that the contract between LJM and Classic is unambiguous. It claims that Judge Petrangaro found that the contract was unambiguous, and that if Classic wanted to disagree with that finding, it should have appeared. But Judge Petrangaro did not find the entire contract unambiguous. A fair reading of her decision shows that she merely held that the documents listed in the purchase order were unambiguously part of the contract. And she said at page 14 of her opinion, of her order, her February 23rd order, the evidence is undisputed that Classic Harper signed off on a purchase order, which incorporated a lot of other documents. However, Classic never requested to see the documents. Classic Harper is responsible for those documents, and there is no ambiguity in the contract. But then she goes on in the same paragraph, which was not quoted in the reply brief, this sentence, the next issue is whether the document actually provides for the requested items. So in other words, what Judge Petrangaro was deciding is, okay, all these documents are part of the contract. Now we've got to see what they really provide. The LJM contends in its reply brief that Classic should have appealed Judge Petrangaro's finding that the documents were incorporated into the purchase order. But you can only appeal a judgment, you can't appeal a finding. LJM does not cite any cases that would say that we can appeal findings of trial courts, the appellate court. If we did that, you gentlemen and ladies would be very, very busy, and that's why you only allow, and the rules only allow judgments to be appealed. There would be no basis for us to take an appeal from a judgment in our favor, which is what this was. And there's a bunch of cases. Mobile, I only say it because it wasn't in there. He didn't make this argument in his motion, a brief of appellate, he put it in the plot. Mobile Oil versus Hurwitz, 63, elapsed third, 430. David Architectural Metals, Inc., 55, elapsed second, 34. Strikas versus Tafoya, 64, elapsed second, 429. City of Moline versus Wimpy, 60, elapsed second, 219. And Garmisa versus Garmisa, 4, elapsed third, 231. All these cases say you can't appeal findings. The purchase order states, and I think we have to look at the language. It says, furnished doors capitalized, frames capitalized, and hardware, as specified in the above reference contract documents. The dictionary definition of specify means to distinguish an object from other things. On page 15 of her order, Judge Petrangaro found that there was no type of lock specified for the doors and drawers described in A46 and A47. Judge Petrangaro found that the contract only required Classic to provide 340 casework cylinder locks. She points out that the drawings do not specify the type of additional locks to be furnished and therefore Classic could not have known what type of lock to price. Now, Council makes an argument in his oral argument about the drawings in question, A46 and A47, being floor plans and therefore within the scope of what we were supposed to be considering and what the scope of the capitalized words doors, frames, and hardware. But if you take a look at these documents, the ones even that are attached to his brief, it refers to them as interior elevations. An interior elevation is not a floor plan. And the floor plans are the documents that show the doors and the frames and their location. And what a contractor does, what a supplier does, is it takes a look at the floor plans to show the doors and the frames. And from that, he takes a look at the specifications and provides the products. Now, here the specifications clearly said 340 cylinder locks. And LJM argues that Judge Petrangaro should have looked to the BHO specification for the type of lock. But that specification calls for 340 cylinder locks. Now, LJM admits that there's an inconsistency between the two quantities in the documents, but claims that's a mistake. Now, there's no evidence as to why that difference occurs. He didn't put the architect on the stand to say, hey, I made a mistake, I meant 783. There's just nothing in the record on that. And the cases are very clear that a conflict between two documents is an ambiguity. And to say that you can have a mistake, which creates a conflict, which is not an ambiguity, that's a distinction without a difference. Ambiguities are construed against the author of the document. In this case, the purchase order was drafted by LJM, and ambiguities are construed against it. LJM cites no authority of the contract. In its reply at pages 4 and 5, LJM quotes language from Exhibit D, which states, should the plans or specifications disagree in themselves or with each other, the trade contractor shall provide the better quality or the greater quality. But LJM is the trade contractor, not Classic. There's some language in the things that a trade subcontractor may be bound by. But Classic isn't a trade subcontractor either. All they did was furnish the material. And what's missing from this contract, which you see in a lot of construction contracts, is a flow-down clause. The type of thing that says, Classic shall be bound to LJM, as LJM is bound to the owner, that language doesn't appear anywhere. What appears is, Classic shall be, is obligated to provide materials specified. And the only thing you add, specified means to identify distinct from everything else. And what, while she, Judge went through this thing very carefully. She didn't rule for us on everything. And she was very careful. As a matter of fact, this is the major thing she ruled. She said that the statement here, that the quantity of the lots could be added by going into drawers and drawings and showing them on the drawings. Well, first of all, these were drawings that were part of the contract, in that sense. But there was nothing to call, just as the whole mess is part of the contract, all the forms, but there was nothing to call Classic's attention to those drawings. They were interior elevations. And they don't specify the kind of lot to be furnished. Council makes a leap of faith that the two are connected, that the specification in the hardware specification is the same lot. But, and Mr. Foley testified as an expert, that generally these kind of cabinet lots are specified in the millwork specification. And nobody introduced the millwork specification into evidence. So we don't know if there's another, if there may be another specification out there that says that the millwork body was to supply these lots. And we really don't know. It doesn't. That reminds me, it doesn't. You know, I think you had an expert that basically said the millwork contractor would normally supply cabinet lots. But, there's no doubt, as I understand, that all your clients did, in fact, supply at least 340 cabinet lots. Yeah, because they put those 340 in the hardware specification. And because, under the understanding of the means of doors, frames, and hardware, it includes whatever's in the hardware specification. It doesn't include what's in the millwork specification. And so that's why he prepared the 340, he furnished the 340 lots. Now, where these other lots were, or what these other lots were supposed to be, Mr. Foley testified that any number of choices of lots existed for those. They didn't all have to be the same. They decided, after the fact, that they wanted the same. But there was nothing in the plans that said that these lots had to be cylinder lots. They just said lots. And Foley and Giovankov said it could be any number of different kinds of lots. So, you know, that's... But... Now, Judge Petrigarov found that the type of lot in drawings A46 and A47 simply wasn't specified. So since it wasn't specified, we have no obligation, the classic had no obligation to furnish it. The classic was only obligated to furnish specified products. Would there be any reason, in looking at the drawings, to assume that these other cabinets, any reason to believe that these other cabinets would have any different drawers, would have any different kinds of lots than the... I don't know, Your Honor. I'm not an expert on that score. But Mr. Foley apparently indicated, thought so, because he said any number of different kinds of lots could go into those cabinets. Well, I suppose that was true for the lots that you provided. They picked this lot, but I suppose, I mean, now wouldn't it make common sense to tell you any other type of lot would also do? We were only supposed to furnish what we were ordered to furnish. And it said 340. It didn't say 783, and there's nothing in the drawing. We don't normally... I will tell you that, to my knowledge, in representing door and hardware suppliers, they don't generally look at the interior elevations because it deals with things that have nothing to do with them. But, okay, they had 340 lots of this sort in the hardware specifications, so they furnished it. There may have been a different lot specified in the millwork. We'll never know because they didn't offer it in the evidence. And besides, that would have been the millwork contractors. That might have been an obligation of a millwork contractor. Who knows? We don't have that information. All we know is that there was no specific description of the lots to be furnished and drawn in 846 and 847, which are not floor plans. They are interior elevations. Okay, fine. Now, there are a number of arguments that Classic makes that LJM simply does not address. Instead of answering the arguments, LJM calls them red herrings, Byzantine language, deconstruction. But these are epithets, not arguments. Judge Pedro Garra didn't reach these additional arguments, but were entitled to make them. And that is that under the Uniform Commercial Code, the course of dealing and usage of trade are important and are admissible to explain words. And when you have three words capitalized, doors, frames, and hardware, that means doors, frames, and hardware. That means that it's the items described in the door hardware specifications and door schedules and frame schedules. Not in interior or elevation schedules. And these weren't even described then. The Illinois Uniform Commercial Code applies to this transaction, but also you had a situation here and a contract can be modified by subsequent contract. And what happened here is, and how the parties treat the contract is important in interpreting it as well. Here, Morrissey told Garbaz, if you order the material, I will get you a change order. So Garbaz, on behalf of Classic, ordered the material. Then they didn't provide it. They said, well, the architect refused to approve the change order. What does that have to do with us? We didn't have a contract with the architect. We had a contract with LJM. LJM said it was going to get a change order for us. They could have issued their own change order. Counselor, your time is up. Thank you. Thank you, Mr. Chairman. Mr. Duggan. Thank you. May I briefly respond to my learned friend, Howard Turner? First, the interior elevations and casework detail are specifically incorporated into the purchase order. And I would refer you to page A31 of the, it's attachment B, and it specifically incorporates A4 and A7, which are the interior elevations, A4.8 and 4.9, which are the interior elevations, and A4.12 and A4.13, which are the casework details. Now, second of all, the argument that there's some kind of estoppel. The testimony was Mr. Morris said he would submit the extra, which he did, and the extra was rejected. Obviously, you know, there's not one scintilla of evidence that we received an extra that we didn't pass on to Classic Hardware. I certainly would want to suggest that's not the case. We never did. We never received $1 that was for an extra. I was suggesting, you were saying $1, he was just suggesting that you, your client, called the hardware company and said, and it was, we'll submit a change order, but in the meantime, get the locks ordered, and then when the change order gets there, we'll... That's exactly right. That's exactly right, Your Honor. That was exactly the conversation, and the change order was rejected. And properly so, because under the contract, the architect argued, as did the contract administrator, that the secure... But I think his point was, and while you address this, is that your client didn't say, hey, you owe us, you didn't supply us all the locks you were required. It was just like, we've got to get a change order that would cause you to have to provide us with more locks. The testimony of the trial was that he demanded it, he required it, they gave him deadlines, they gave classic hardware deadlines to get the items. He supplied the first, second, and they said they would submit an extra. They submitted 19 different extras, and this was rejected. But back again to the idea about where it's located in the specifications. In the miscellaneous items on the door hardware schedule, it doesn't say lock cylinders. It says 340 lock cylinders, open parentheses, cabinets, close parentheses. It specifies where those lock cylinders are. The Exhibit D to the contract was admitted without... I'm sorry, Exhibit D, LJM Exhibit D in the trial was admitted. It's a full schedule of the 738 locations where there are doors and doors on the plans and specifications. I'm sorry, on the plans. And there was no contradiction of that testimony. It was uncontradictable because it was really only a matter of counting. And in fact, we did ask that question of his expert, Mr. Foley, and he kept saying, well, ordinarily, someone else does it. I says, don't answer the question. Don't tell us what ordinarily is done. Based on the plans and specifications on this job, you can count the number of doors and doors, can you not? He says, yes, I can count. That's a simple function. You could do it, Classic could do it, LJM could do it. That's not an expert function, is it? He says, that's correct. There are 738 instances where there are doors. There are 14... He argued that there was nothing that alerted him to even look here. However, there are 14 instances on the plans which are specifically incorporated into the contract and so found by the judge that had a typical note, all doors and drawers to receive locks refer to specifications. And the only place in the specifications where a particular type of lock for cabinets is indicated is this particular sergeant lock in miscellaneous hardware where it says 340 lock cylinders, sergeant style 4143 open parenthesis cabinets. And I just don't see any ambiguity here. I don't think the court found any ambiguity. Yes, there was a contradiction in the quantities between the plans and the specifications, but the contract answered that contradiction. It said that the larger amount was required. Now, what we were required to do was to supply everything per the general contract. What they were required to do was to supply all the hardware per the plans and specifications that... And each one of the plans and specifications that was the predicate of our obligation to supply these cabinet locks was specifically incorporated into the purchase order of classic hardware. So I don't really think there's any ambiguity whatsoever. I don't think the evidence should have been admitted. We objected to it. The UCC does not say that there's no limit to evidence. It says that you cannot contradict the written contract with parole evidence. You can supplement it with trade usage or explanation. This is not supplemental. This is contradicting it. Thank you. Any questions? I guess not. Thank you. Thank you. And thank you both for your argument today. We will take this matter under advisement and get back to you with a written disposition within a short time. We'll now take a short recess for a panel discussion. Recess.